UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

STEPHEN BRIAN TURNER,

        Plaintiff,

    v.

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

Case No.  14-cv-04525-MEJ

**ORDER RE: CROSS-MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 19, 20

**INTRODUCTION**

Plaintiff Stephen Brian Turner ("Plaintiff") brings this action pursuant to 42 U.S.C. §
405(g), seeking judicial review of a final decision of Defendant Carolyn W. Colvin, the Acting
Commissioner of Social Security, denying Plaintiff's claim for disability benefits.  Pending before
the Court are the parties' cross-motions for summary judgment.  Dkt. Nos. 19, 20.  Pursuant to
Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument.
Having carefully reviewed the parties' positions, the Administrative Record ("AR"), and relevant
legal authority, the Court hereby **DENIES** Plaintiff's motion and **GRANTS** the Commissioner's
cross-motion for the reasons set forth below.

**BACKGROUND**

Plaintiff was born on October 19, 1954, and was 51 years old on his disability onset date.
AR 149, 156.  He completed more than four years of college and graduated from medical school.
AR 225, 406.  His past relevant work was as a medical examiner or medical assistant.  AR 18.

During his medical residency, Plaintiff was convicted of lewd and dissolute conduct for
exposing himself to two minors at his workplace as well as other public places in 1984.  AR 332.
His medical license was revoked initially for unprofessional conduct, then stayed pending

United States District Court
Northern District of California

probation. *Id* He was convicted of indecent exposure after exposing himself again in 1992. *Id.* His medical license was suspended and he was placed on probation by the medical board. AR 327, 333, 340-42. During his probationary period, Plaintiff was required to undergo therapy. AR 334. His psychiatrist diagnosed him with exhibitionism and personality disorder with predominance of narcissistic and passive aggressive features of moderate severity. AR 336. In the context of administrative proceedings before the medical board, Plaintiff's psychiatrists differed on their optimism about Plaintiff's prognosis, but they all noted that personality characteristics are very difficult to treat. AR 336-37, 339. Plaintiff eventually agreed to surrender his medical license in 1998. AR 345.

From May 2006 to January 2010, Plaintiff was incarcerated for grand theft and practicing medicine without a license. AR 406. He had been providing medical care to immigrant patients and billing for payment on procedures and tests that were never done. AR 760. He was repeatedly incarcerated after 2010 due to parole violations. AR 483, 502, 525, 591, 631, 635, 763, 784. While incarcerated, Plaintiff obtained mental health treatment primarily for diagnoses of exhibitionism, major depressive disorder, adjustment disorder, dysthymic disorder, anxiety, and narcissistic personality traits. AR 395, 398, 410, 416. His Global Assessment of Functioning ("GAF") scores generally ranged from 60-65.[1] AR 410, 412.

In an evaluation on May 14, 2007, Plaintiff reported he attended a residential school for emotionally disturbed children when ages 10-14. AR 403, 406, 409. While incarcerated, he was on several anti-depressants, but felt that none of them worked. AR 407. On examination, he had an anxious and depressed mood, poor sleep, paranoia, poor insight, and poor judgment. AR 408. Plaintiff was not interested in taking psychiatric medications at that time. AR 409. On mental

---

[1] According to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV"), a GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000). GAF scores of 61 to 70 indicate some mild symptoms or some difficulty in social, occupational, or school functioning, but the patient is generally functioning pretty well. *Id.*

2

status examination, Plaintiff exhibited cooperative behavior, anxious and depressed mood, normal affect, normal intellectual functioning, normal memory, normal attention, normal thought process, but some paranoia, and poor insight and judgment.  AR 408.

On May 30, 2007, Plaintiff presented with anxiety and some depression.  AR 399.  He was quite fearful, having recently been beaten.  *Id*.  Plaintiff received a prescription for Prozac.  *Id*.  On mental status examination, he exhibited an anxious mood, normal affect, and normal cognition.  AR 400.  Plaintiff's doctor assessed a GAF score of 60, and opined that Plaintiff's functional impairment was "mild."  AR 401.

In October 2007, Plaintiff reported that he was "not doing very well at all."  AR 419.  He was not taking his prescribed medication, and he reported a long history of poor and impulsive behaviors and decision-making.  *Id*.  In January 2008, Plaintiff's psychologist discussed his poor social skills with him.  AR 418.  His energy was down but his activities of daily living were improving.  *Id*.  In March 2008, Plaintiff's psychiatrist noted that Plaintiff was  cooperative but attention seeking at times.  AR 412.  He was assessed a GAF score ranging between 60 and 65.  AR 412.  In August 2008, Plaintiff was somewhat hyper-talkative; his behavior was cooperative; his mood and affect were within normal limits; his attention, concentration, and memory were within normal limits; and his insight and judgment were fair to poor.  AR 397.

In May 2009, Plaintiff had not been taking psychotropic medications and requested removal from the mental health system.  AR 393.  On mental status examination, he was cooperative, with mood and affect within normal limits; normal attention, memory and concentration; and his insight and judgment were impaired.  AR 394.  His diagnoses were exhibitionism and narcissistic personality traits, with a GAF score of 65.  AR 395.

Plaintiff was released from prison in January 2010 and placed on parole, after which he continued treatment.  AR 314, 445.  He returned to prison at least eight times for parole violations.  AR 32, 348.  During an initial evaluation on March 1, 2010, Plaintiff's mental status was a little hyper, intense, and obsessive; there was no indication of significant psychiatric disturbance; his cognition was organized and goal directed; his speech was clear; his memory was intact; his mood

1   seemed euthymic (non-depressed); and his affect was appropriate.  AR 763-64.  His children were

2   upset with him, but he was mending his relations with his ex-wife.  AR 764.  He reported having a

3   girlfriend while married and was a frequent visitor to massage parlors.  *Id.*  Plaintiff reported that

4   he became depressed and had some suicidal thoughts while he was in prison, but he was

5   prescribed anti-depressant medications for a while "and they 'snapped [him] out of [his]

6   depression.'"  *Id.*  Plaintiff was considered "low risk for sexual recidivism while on supervised

7   and monitored parole."  AR 763.

8        On March 11, 2010, Plaintiff reported high anxiety, some compulsiveness, and insomnia.

9   AR 446.  He was alert, oriented, and had an anxious mood.  AR 452.  Plaintiff's diagnoses were

10  OCD, generalized anxiety disorder, and narcissistic personality disorder.  *Id.*  His GAF score was

11  38.  *Id.*  Plaintiff also stated that he "loathe[d] . . . restart[ing] SSRIs due to sexual side effects"

12  and was prescribed Ambien.  *Id.*

13       The next month, April 2010, Plaintiff was re-incarcerated after a parole violation.  AR 483.

14  In a Prison Health Services Medical Request Form dated April 11, 2010, Plaintiff reported being

15  extremely depressed and distraught because he was arrested for talking to his fiancé.  AR 591.  He

16  reported having a multi-million dollar lawsuit against the parole department and believed that his

17  current incarceration was a vendetta against him for filing the lawsuit.  *Id.*

18       While incarcerated on July 16, 2010, Plaintiff reported a chronically low mood.  AR 483.

19  His mood was agitated with matching affect.  AR 494.  He was having difficulty managing myriad

20  legal issues which he started as a result of his perception that he was treated unconstitutionally.

21  AR 494.  On mental status examination, Plaintiff exhibited no apparent memory or cognitive

22  deficits, his thinking was clear and organized, and he received a GAF score of 65.  AR 484.  His

23  characterological problems had seriously interfered with his insight and judgment around his legal

24  and emotional issues.  *Id.*

25       On July 30, 2010, Plaintiff was seen for a wellness check.  AR 493.  He reported that he

26  was a little anxious, but "pretty good generally."  *Id.*  Plaintiff exhibited euthymic mood, normal

27  cognition, logical and goal-oriented thought process, and he appeared to be stable.  *Id.*

28

United States District Court
Northern District of California

In August 2010, his provider told him he rambles, had very poor listening skills, and was difficult to interrupt.  AR 492.  The next month he stated he was very depressed.  AR 573.  He was paroled again but re-incarcerated in October 2010,with another parole violation when he was at a park.  AR 483, 491.

In October 2010, Plaintiff's chief complaint to his therapist was largely around the injustices of the legal system.  AR 483.  Plaintiff denied that medications were substantially effective in the past.  *Id.*  The therapist noted a strong axis II component of the clinical picture and that Plaintiff had a long history of narcissism, as well as traits and features of antisocial behaviors.  *Id.*  He was stable without psychiatric medications.  AR 491.  Plaintiff was not ready to take psychiatric medications, as he understood that his primary problem was a personality disorder.  *Id.*  Plaintiff also noted that medications might only temporarily soften that pathology, as he did not take any psych meds on the street.  *Id.*   He was marginally groomed with an anxious/euthymic mood.  *Id.*  His cognition was within normal limits, and his thought process was logical and goal-oriented.  *Id.*  He talked a lot and had a hard time listening.  *Id.*  Plaintiff received a GAF diagnosis of 70.  AR 479.

On November 12, 2010, Plaintiff reported that he was doing "fine," and "overall ha[d] few outstanding [mental health] complaints."  AR 490.  On mental status examination, he had cooperative behavior, euthymic mood, normal cognition, and he appeared to be stable.  *Id.*  On November 17, 2010, Plaintiff reported that he had pervasive interpersonal difficulties leading to multiple relationship, job, and ultimately, legal problems.  AR 489.  Plaintiff reported that he was successfully treated with Effexor while he was in jail, but that the dosage of his current prescription was too high, which caused anxiety.  *Id.*  Plaintiff  then refused Effexor for a month.  *Id.*  Plaintiff reported that his mood improved with decreased anxiety, because he was due to be released on parole *Id.*  On mental status examination, he exhibited an "ok" mood, affect and cognition within normal limits, linear thought process, but was "somewhat digressive."  *Id.*  Given the benefit of a low dose of Effexor, Plaintiff resumed the medication.  *Id.*

In December 2010, Plaintiff was restarted on a low dose of Effexor and appeared stable.

United States District Court
Northern District of California

United States District Court
Northern District of California

AR 488.  On mental status examination, Plaintiff exhibited cooperative behavior, euthymic  mood, cognition within normal limits, and logical and goal-directed thought process.  *Id*.  He denied any suicidal ideation.  *Id.*

On January 1, 2011, Plaintiff reported that he was a little depressed, but that the medication helped.  AR 487.  He exhibited an angry and depressed mood, and received a GAF score of 60.  *Id*.  On January 18, 2011, Plaintiff exhibited cooperative behavior, euthymic mood, cognition within normal limits, and received a GAF of 65.  AR 475-76.

On January 27, 2011, Plaintiff reported that his "medication [wa]s very helpful with depression."  AR 767.  Plaintiff believed that his indecent exposure problem continued to be in sustained remission, and that he no longer had any interest in deviant sexual behavior.  AR 770.  Plaintiff's social worker assessed that Plaintiff had recent situational depression while in custody, but improved with medication.  *Id*.  Plaintiff received a GAF of 65.  *Id*.  He presented as pleasant and friendly, a little hyper and intense and obsessive, with no indication of significant psychiatric disturbance.  AR 772.  His cognition was organized and goal-directed, his memory was intact, and his mood seemed euthymic with appropriate affect.  *Id*.

In February 2011, Plaintiff was back on parole.  AR 766-67.  He described being either in his room or at the law library, and was busy preparing documents for court.  AR 767.  He was mentally stable and at low risk for recidivism.  *Id*.

Later in February 2011, Plaintiff had another parole violation after his ankle bracelet apparently broke.  AR 524-25.  He was hospitalized for three days on a 5150 when he stated that he wanted to kill himself.  AR 525, 530.  Plaintiff was "mildly grandiose and somewhat expansive but mindful enough and clearly intelligent enough to attenuate responses in an amended way that was more appropriate."  AR 531.  He admitted to frequent highs, rapid thoughts, plenty of energy, and chronic difficulty sleeping.  *Id*.  He was perseverating about his almost 300 page legal writ.  *Id*.  There was no genuine psychosis.  AR 525.  His thoughts of self-harm were considered at the time, genuine and his anxiety attack real.  *Id*.  His GAF was 40 on admission and 50 on discharge.  AR 524.

In April 2011, Plaintiff was hospitalized again with another 5150 with thoughts of killing himself after another parole violation for downloading pornography on his computer, which he denied.  AR 502, 756.  He "was caught up in technicalities and blamed the situation, rather than his repeated behavior."  AR 511.  His GAF was 20 on admission and 50 on discharge.  AR 502.  His mood was angry, affect irritable with overvalued ideations, insight diminished and impaired judgment.  AR 509.  His diagnoses were mood disorder and personality disorder.  AR 502.  He was "worked up and unable to speak coherently or be redirected."  AR 511.  He also reported a September 2010 suicide attempt..  AR 503.

On August 2, 2011, Plaintiff was mentally stable, but stressed about his parole conditions.  AR 783.  On mental status examination, his cognition was organized and goal-directed, his memory was intact, his mood was euthymic and his affect was appropriate.  AR 792.  He received a GAF score of 65.  AR 791.

On August 11, 2011, Plaintiff reported that Effexor was "effective without side effect."  AR 781.  Plaintiff admitted to increasing the dosage due to ongoing anxiety in regards to his difficult parole conditions.  *Id.*  On mental status examination, he was polite with a calm mood.  *Id.*  He continued to have depression and anxiety, but they were improved and stable on a low dose of medication.  AR 781-82.  Plaintiff reported that his case was going to the California Supreme Court.  AR 782.  His social worker noted that Plaintiff seemed resistant to getting a job because he was busy with legal proceedings and wanted to write a book.  *Id.*  On August 17, 2011, Plaintiff "denie[d] feeling depressed."  AR 781.  On August 31, 2011, he reported getting real anxious, but Effexor helped.  AR 780.  He found a lawyer and was in good spirits, but he was "wound up like a top."  *Id.*  His social worker noted that his anxiety was improved with Effexor.  *Id.*

In September 2011, Plaintiff reported that he had not received his Effexor medication for two weeks.  AR 779-80.  He needed Effexor and was anxious.  AR 80.  He was quite wound-up over his parole situation and legal pursuits, but he was "[g]enerally stable on psych medication."  *Id.*  He continued to pursue legal counsel.  *Id.*

United States District Court
Northern District of California

7

In November 2011, Plaintiff continued Effexor.  AR 779.  It was noted that the medication was partially effective, but Plaintiff still felt quite anxious.  *Id.*  He was chronically frustrated and had difficulty sleeping, ruminating over the injustice of his parole conditions.  *Id.*  It was suggested that Plaintiff receive a higher dose of Effexor.  *Id.*  In December 2011, a higher dose of Effexor helped.  *Id.*  Plaintiff did not have any side effects to the medication, was less anxious, and his outlook appeared somewhat brighter and more hopeful.  *Id.*  Plaintiff's doctors assessed improved anxiety and mood symptoms on higher dose of Effexor.  *Id.*

Later in December 2011, another 5150 hold resulted after an arrest for a parole violation.  AR 635.  Plaintiff was suing several hotels for allowing parole agents to enter without arrest warrants.  AR 641.  He was kicked out of his hotel because of the lawsuits and stayed in a shelter, which resulted in him violating parole.  *Id.*  He also filed two lawsuits against the parole department for his charges of resisting arrest and terrorist threats.  AR 641, 744-45.  Plaintiff believed he was a victim of persecution, retaliation, and entrapment.  AR 641.  His discharge GAF was 40.  AR 635.

On December 20, 2011, Plaintiff reported that he was no longer suicidal.  AR 745, 748.  He claimed his mood was "normal" and reported that he was not feeling as overwhelmed as when he was first brought into custody.  AR 745.  He presented with a sad, blunted affect and appeared to have low energy, but no suicidal ideation and his behavior was within normal limits.  AR 745, 748.

On January 5, 2012, Plaintiff was planning to write a book.  AR 744.  He was taking Depakote and Effexor, which were "working well for him," and decreased his level of anxiety.  AR 743-44.  On mental status examination, Plaintiff exhibited euthymic mood, full affect, intelligent, linear and logical thought process, cooperative and polite behavior, and no suicidal ideation.  AR 744.  On January 19, 2012, Plaintiff reported that he was "doing alright," and exhibited a euthymic mood, full affect, he was fully engaged, with a linear and intelligent though process.  AR 742.

On March 1, 2012, Plaintiff continued to feel that his current dose of "Effexor . . . [wa]s

8

helping [his] mood and anxiety." AR 778. His history included being kicked out of several medical residency programs and being a problem employee who could not get along with others. *Id.* Plaintiff stated that his prior history was the reason for him being self-employed during his last job. *Id.* It was unclear if his chronic interpersonal and work difficulties were attributable to residual ADHD or possibly represented a personality disorder. *Id.* Plaintiff's doctor assessed that his mood and anxiety were improved on Effexor. *Id.*

When taken into custody in April 2012, Plaintiff was placed on another 5150 hold. AR 631. He was clearly manic, hyperverbal, circumstantial, labile, talkative, and reported poor sleep. *Id.* His presentation was somewhat grandiose. *Id.* Plaintiff claimed that he was being persecuted and that he had written a book about to be published, which would cause the parole agency to be shut down. *Id.* His impulse control, insight, and judgment were poor. *Id.* He made it clear he was not depressed until his parole was revoked. *Id.* His providers stated this incident was the fourth time he was claiming depression and suicidal ideations in context of returning to jail for parole violations. AR 633. The provider also noted that it was likely an attempt to avoid incarceration, but that Plaintiff required a brief period of observation to assure his safety. *Id.* His GAF was 50. *Id.*

Later in April 2012, Plaintiff exhibited an excited mood, but he had full range of affect, he was easily engaged, and he had intelligent, linear, and logical thought process. AR 739. In May 2012, Plaintiff exhibited an "alright" mood and reported that his medications were "okay." AR 736. He exhibited a euthymic mood. *Id.*

In July 2012, Plaintiff was arrested when he went out of the county to file a federal lawsuit. AR 784. He was focused on what he believed was unfair and abusive treatment. AR 776. Plaintiff reported that as far as his mental health treatment was concerned, the Effexor medication was helpful for his anxiety with no side effects, and that he did not require further assistance. . AR 776-77.

In addition to his psychiatric treatment, Plaintiff also had an emergency room visit due to a syncopal episode of an unknown cause in 2007. AR 358, 363. In 2008, he had a left shoulder

United States District Court
Northern District of California

1    rotator tear after rolling off his bunk bed, falling onto a concrete floor.  AR 366.  Imaging also

2    showed C4-5 degenerative disc disease with prominent posterior osteophyte neural encroachment

3    bilaterally.  AR 379, 381.

4         State agency reviewing physicians initially found insufficient evidence to evaluate

5    Plaintiff's claims.  AR 466, 469.  Heather Barrons, Psy.D, later noted in July 2011that medical

6    evidence was borderline as to sufficiency of functional evidence.  AR 606-16.  B. Williams, M.D.,

7    opined that Plaintiff had a "clear" medically determinable impairment, but that his level of

8    functioning was unclear..  AR 619.  Dr. Williams noted that it would be helpful to see Plaintiff's

9    reports as well as collateral evidence from a third party.  *Id*.

10        Dr. Barrons diagnosed depression and personality disorder with antisocial and narcissistic

11   features.  AR 606, 611.  She found moderate limitations in social functioning; moderate

12   limitations in concentration, persistence, or pace; and mild limitations in activities of daily living.

13   AR 614.  In a Residual Function Capacity ("RFC")[2] assessment, Dr. Barrons concluded that

14   Plaintiff was capable of understanding and remembering simple instructions and brief public

15   contact.  AR 605.  Dr. Barrons reasoned that Plaintiff's primary medically determinable

16   impairment was his personality disorder and he likely had a more mild mood component as well.

17   AR 616.  She noted that Plaintiff was rather sophisticated in his manipulation of the legal process

18   as well as the mental health system, but that objective observations by treating physicians showed

19   few significant symptoms.  *Id*.

20        In his disability reports, Plaintiff reported he was occasionally disoriented and had

21   difficulty with memory and periodic episodes of severe depression.  AR 242.  His depression

22   interfered with proper hygiene, grooming, and sleep.  AR 245.  He also reported that he did not eat

23   well, had trouble sleeping, and had more difficulty taking care of himself due to his depression.

24   AR 281.

25

26

27   [2] As discussed below, RFC refers to what an individual can do in a work setting, despite mental or
     physical limitations caused by impairments or related symptoms.  20 C.F.R. § 404.1545(a)(1).

28
                                                    10

United States District Court
Northern District of California

## SOCIAL SECURITY ADMINISTRATION PROCEEDINGS

This matter arises from Plaintiff's applications for Disability Insurance Benefits and Supplemental Security Income on March 16, 2010.  Administrative Record ("AR") 149, 156.  In both applications, Plaintiff's alleged onset date is February 1, 2006, and his date last insured is December 2009.  AR 160, 178.  Following the denial of his claims, Plaintiff requested a hearing, which was held on February 7, 2013, before Administrative Law Judge ("ALJ") Philip E. Callis.  AR 26-44.  Plaintiff testified in person at the hearing and was represented by counsel, Aggie Rose-Chavez.  The ALJ also heard testimony from Vocational Expert, Joel Greenberg.

**A.   Plaintiff's Testimony**

Plaintiff testified with representation by counsel at the February 7, 2013 hearing.  He testified that he was currently living at a shelter.  AR 31.  At the time, he was on parole and had been violated eight times.  AR 32.  He could not work because he was taking Effexor for severe anxiety and depression, and his parole was a very difficult situation.  *Id.*  Plaintiff had problems with just about every job he had ever had.  *Id.*

Plaintiff spent his time reading and going to the library.  AR 33.  Though he had contacted about 100 attorneys, he found it difficult to find an attorney to take his case either pro bono or on a contingency basis.  *Id.*  He was under tremendous stress.  *Id.*  Because Plaintiff was suing his psychologist, he did not complete psychiatry treatment as required by the terms of his parole.  AR 33-34.  In regards to his daily activities, Plaintiff testified that he reads, is involved in litigation, and goes to the library.  AR 33.

**B.   Vocational Expert's Testimony**

The vocational expert testified that Plaintiff's past relevant work was that of a medical assistant, Dictionary of Occupational Titles ("DOT") 079.362-010,[3] with light specific vocational

---

[3] The DOT describes the medical assistant position as follows: "Performs any combination of following duties under direction of physician to assist in examination and treatment of patients: Interviews patients, measures vital signs, such as pulse rate, temperature, blood pressure, weight, and height, and records information on patients' charts. Prepares treatment rooms for examination of patients. Drapes patients with covering and positions instruments and equipment. Hands instruments and materials to doctor as directed. Cleans and sterilizes instruments. Inventories and

preparation ("SVP") 6.[4]  AR 39-40.  An individual, who was limited to performing only simple,

routine, or repetitive tasks with occasional public contact, would be unable to perform Plaintiff's

past work.  AR 40.  The individual could perform representative occupations such as hand

packager, DOT 920.587-018, janitor, DOT 381.687-014, and final inspector, electrical equipment,

DOT 727.687-054.  AR 40-41.

The vocational expert also testified that an individual with any of the following limitations

would be unable to maintain employment: (1) inability to maintain his concentration and pace

throughout the day for up to 25 percent of the work day; (2) two to three absences a month on a

consistent basis; (3) getting into disputes and arguments and ending up suing coworkers and

supervisors; and (4) getting fed-up and leaving the job suddenly without notice to his supervisor,

which happens on a consistent basis.  AR 42-43.  The vocational expert stated his testimony was

consistent with the DOT and his own experience.  AR 43.

## C.    The ALJ's Findings

The regulations promulgated by the Commissioner of Social Security provide for a five-

step sequential analysis to determine whether a Social Security claimant is disabled.[5]  20 C.F.R. §

404.1520.  The sequential inquiry is terminated when "a question is answered affirmatively or

negatively in such a way that a decision can be made that a claimant is or is not disabled."  *Pitzer*

*v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990).  During the first four steps of this sequential

_____

orders medical supplies and materials. Operates x ray, electrocardiograph (EKG), and other
equipment to administer routine diagnostic test or calls medical facility or department to schedule
patients for tests. Gives injections or treatments, and performs routine laboratory tests. Schedules
appointments, receives money for bills, keeps x ray and other medical records, performs
secretarial tasks, and completes insurance forms. May key data into computer to maintain office
and patient records. May keep billing records, enter financial transactions into bookkeeping
ledgers, and compute and mail monthly statements to patients."  DOT 079.362–010.

[4] "The DOT lists a specific vocational preparation (SVP) time for each described occupation.
Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds
to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds
to an SVP of 5-9 in the DOT."  S.S.R. 00-4P.  In other words, a higher SVP time corresponds to
higher level positions that require increased training time.
[5] Disability is the "inability to engage in any substantial gainful activity" because of a medical
impairment which can result in death or "which has lasted or can be expected to last for a
continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

United States District Court
Northern District of California

1    inquiry, the claimant bears the burden of proof to demonstrate disability.  *Valentine v. Comm'r*

2    *Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).  At step five, the burden shifts to the

3    Commissioner "to show that the claimant can do other kinds of work."  *Id.* (quoting *Embrey v.*

4    *Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

5         The ALJ must first determine whether the claimant is performing "substantial gainful

6    activity," which would mandate that the claimant be found not disabled regardless of medical

7    condition, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(i), (b).  Here, the ALJ

8    determined that Plaintiff had not performed substantial gainful activity since February 1, 2006, the

9    alleged onset date of his disability.  AR 13.

10        At step two, the ALJ must determine, based on medical findings, whether the claimant has

11   a "severe" impairment or combination of impairments as defined by the Social Security Act.  20

12   C.F.R. § 404.1520(a)(4)(ii).  If no severe impairment is found, the claimant is not disabled.  20

13   C.F.R. § 404.1520(c).  Here, the ALJ determined that Plaintiff had the following severe

14   impairments: narcissistic personality disorder and antisocial personality disorder.  AR 13.

15        If the ALJ determines that the claimant has a severe impairment, the process proceeds to

16   the third step, where the ALJ must determine whether the claimant has an impairment or

17   combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpt.

18   P, App. 1.  20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant's impairment either meets the listed

19   criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, he is

20   conclusively presumed to be disabled, without considering age, education, and work experience.

21   20 C.F.R. § 404.1520(d).  Here, the ALJ determined that Plaintiff did not have an impairment or

22   combination of impairments that meets the listings.  AR 14.

23        Before proceeding to step four, the ALJ must determine the claimant's Residual Function

24   Capacity ("RFC").  20 C.F.R. § 404.1520(e).  RFC refers to what an individual can do in a work

25   setting, despite mental or physical limitations caused by impairments or related symptoms.  20

26   C.F.R. § 404.1545(a)(1).  In assessing an individual's RFC, the ALJ must consider all of the

27   claimant's medically determinable impairments, including the medically determinable

28                                                    13

United States District Court
Northern District of California

1   impairments that are nonsevere.  20 C.F.R. § 404.1545(e).  Here, the ALJ determined that Plaintiff

2   has the RFC to "perform a full range of work at all exertional levels but is limited to simple

3   repetitive tasks with occasional public contact."  AR 14.

4          The fourth step of the evaluation process requires that the ALJ determine whether the

5   claimant's RFC is sufficient to perform past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv);

6   404.1520(f).  Past relevant work is work performed within the past 15 years that was substantial

7   gainful activity, and that lasted long enough for the claimant to learn to do it.  20 C.F.R. §

8   404.1560(b)(1).  If the claimant has the RFC to do his past relevant work, the claimant is not

9   disabled.  20 C.F.R. § 404.1520(a)(4) (iv).  Here, the ALJ determined that Plaintiff could not

10  perform his past relevant work.  AR 17-18.

11         In the fifth step of the analysis, the burden shifts to the Commissioner to prove that there

12  are other jobs existing in significant numbers in the national economy which the claimant can

13  perform consistent with the claimant's RFC, age, education, and work experience.  20 C.F.R. §§

14  404.1520(g); 404.1560(c).  The Commissioner can meet this burden by relying on the testimony of

15  a vocational expert or by reference to the Medical-Vocational Guidelines at 20 C.F.R. Part 404,

16  Subpt. P, App. 2.*Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).  Here, based on

17  the testimony of the vocational expert, Plaintiff's age, education, work experience, and RFC, the

18  ALJ determined that there are jobs that exist in significant numbers in the national economy that

19  Plaintiff could perform, such as hand packager, janitor, and final inspector of electrical equipment.

20  AR 18-19.

21  **D.      ALJ's Decision and Plaintiff's Appeal**

22         On March 7, 2013, the ALJ issued an unfavorable decision finding that Plaintiff was not

23  disabled.  AR 11-19.  This decision became final when the Appeals Council declined to review it

24  on August 14, 2014.  AR 1-3.  Having exhausted all administrative remedies, Plaintiff commenced

25  this action for judicial review pursuant to 42 U.S.C. § 405(g).  On March 13, 2015, Plaintiff filed

26  the present Motion for Summary Judgment.  Dkt. No. 19.  On April 9, 2015, the Commissioner

27  filed a Cross-Motion for Summary Judgment.  Dkt. No. 20.

28                                          14

**LEGAL STANDARD**

This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42 U.S.C. § 405(g).  The ALJ's decision must be affirmed if the findings are "supported by substantial evidence and if the [ALJ] applied the correct legal standards."  *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted).  "Substantial evidence means more than a scintilla but less than a preponderance" of evidence that "a reasonable person might accept as adequate to support a conclusion."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)).  The court must consider the administrative record as a whole, weighing the evidence that both supports and detracts from the ALJ's conclusion.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).  However, "where the evidence is susceptible to more than one rational interpretation," the court must uphold the ALJ's decision.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citation omitted).  Determinations of credibility, resolution of conflicts in medical testimony, and all other ambiguities are to be resolved by the ALJ.  *Id.*

Additionally, the harmless error rule applies where substantial evidence otherwise supports the ALJ's decision.  *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990).  A court may not reverse an ALJ's decision on account of an error that is harmless.  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006)).  "'[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.'"  *Id.* (quoting *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)).

**DISCUSSION**

Plaintiff raises four issues in his motion: (1) whether his impairments met or equaled Listing 12.08; (2) whether the ALJ properly evaluated his RFC; (3) whether the ALJ provided sufficient explanation for his credibility assessment; and (4) whether the ALJ had a duty to further develop the record.  The Court shall consider each in turn.

1

2

3

4

5

6

7

8

9

10

11

12

United States District Court
Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**A.      Listing 12.08**

The ALJ found Plaintiff has severe impairments including narcissistic personality disorder and antisocial personality disorder.  AR 13.  Plaintiff argues that the ALJ provided no more than boilerplate findings and, despite his "attorney's detailed pre-hearing brief explaining how Mr. Turner met each element of listing 12.08 (personality disorders), the ALJ failed to mention listing 12.08."  Pl.'s Mot. at 3.  Plaintiff maintains that he meets each element of Listing 12.08, and the ALJ "erred in neglecting to mention the listing at all and provided no more than boilerplate language at step three."  *Id.*

In response, Defendant argues that the ALJ properly evaluated whether Plaintiff met a Listing at step three of the sequential evaluation process using the technique set out in 20 C.F.R. §§ 404.1520(a), 416.920(a).  Def.'s Mot. at 2.  Under this technique, the Commissioner rates the degree of the claimant's mental limitations in four broad functional areas: activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation.  20 C.F.R. §§ 404.1520(a), 416.920(a).  Then, the Commissioner compares these ratings to the criteria in the appropriate listing.  *Id.*  Although the ALJ did not specifically identify his consideration of Listing 12.08, Defendant maintains that the ALJ rated Plaintiff's functioning in each of the four broad functional categories and found that Plaintiff's mental impairments do not cause at least two "marked" limitations, which is necessary for Plaintiff to meet the criteria for Listing 12.07.  Def.'s Mot. at 2.

As discussed above, at step three, the ALJ must determine whether the claimant has an impairment or combination of impairments that meet or equals an impairment listed in 20 C.F.R. Part 404, Subpt. P, App. 1.  Listing 12.08 refers to "Personality Disorders."[6]  20 C.F.R. Part 404, Subpart P, App. 1, § 12.08.  In order to meet Listing 12.08, a claimant must be able to show that that he meets the requirements of both subsections "A" and "B."  *Id.*  To satisfy the criteria set

---

[6] 12.08 Personality Disorders: "A personality disorder exists when personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress. Characteristic features are typical of the individual's long-term functioning and are not limited to discrete episodes of illness."  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

forth in subsection A, the claimant must be able to show behavior associated with one of the following: (1) seclusiveness or autistic thinking; (2) pathologically inappropriate suspiciousness or hostility; (3) oddities of thought, perception, speech and behavior; (4) persistent disturbances of mood or affect; (5) pathological dependence, passivity, or aggressivity; or (6) intense and unstable interpersonal relationships and impulsive and damaging behavior.  *Id.*  To satisfy the criteria set forth in subsection B, the claimant must be able to show that he has at least two of the following: "(1) Marked restriction of activities of daily living; or (2) Marked difficulties in maintaining social functioning; or (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration."  *Id.*

A claimant bears the burden of proving that his or her impairments satisfy all the criteria of a particular listing.  *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) ("Tackett had to establish that he met or equaled each of the following characteristics of a listing.").  "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

In the present case, the ALJ concluded at step three that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  AR 14.  In coming to this conclusion, the ALJ considered whether Plaintiff's mental impairments met the criteria of Listing 12.07 (somatoform disorders).  *Id.*  20 C.F.R. Part 404, Subpart P, App. 1, § 12.07.  Listing 12.07 has the same subsection B requirements as Listing 12.08, and both require a claimant to satisfy at least two of the criteria set forth therein.  *Id.*  Thus, although the ALJ did not specifically identify Listing 12.08, he rated Plaintiff's functioning in each of the four broad functional categories.  AR 14.  The ALJ found that Plaintiff had moderate difficulties in his activities of daily living, moderate difficulties with social functioning, moderate difficulties with concentration, persistence and pace, and no episodes of decompensation.  AR 14.  Thus, the ALJ found that Plaintiff's mental impairments do not cause at least two "marked" limitations, which is necessary for him to

United States District Court
Northern District of California

17

1    meet the "Paragraph B" criteria for Listing 12.07.  AR 14.  *See* 20 C.F.R. Part 404, Subpart P,

2    App. 1, §§ 12.07, 12.08.  Although the ALJ did not specifically discuss whether Plaintiff met

3    Listing 12.08, his analysis for Listing 12.07 was equally applicable to Listing 12.08.

4              Moreover, the ALJ's determination was supported by substantial evidence.  The ALJ noted

5    that Plaintiff's "numerous jail and prison terms, the loss of his license to practice medicine for

6    repeated acts of exposing himself, and his statements about suing everyone involved, including

7    parole agents and mental health professionals, are consistent with a mental disturbance."  AR 17.

8    However, he found that "there is no persuasive evidence that the claimant would be unable to

9    perform simple, repetitive tasks, if limited to only occasional public contact."  *Id.*  The record

10   supports this finding.  In May 2007, Plaintiff's doctor opined that Plaintiff's functional impairment

11   was "mild."  AR 401.  In August 2008, Plaintiff's behavior was cooperative; his mood and affect

12   were within normal limits; his attention, concentration, and memory were within normal limits;

13   and his insight and judgment were fair to poor.  AR 397.  In May 2009, Plaintiff had not been

14   taking psychotropic medications and requested removal from the mental health system.  AR 393.

15   On mental status examination, he was cooperative, with mood and affect within normal limits;

16   normal attention, memory and concentration; and his insight and judgment were impaired.  AR

17   394.  During an evaluation on March 1, 2010, the evaluator found no indication of significant

18   psychiatric disturbance; Plaintiff's cognition was organized and goal directed; his speech was

19   clear; his memory was intact; his mood seemed euthymic (non-depressed); and his affect was

20   appropriate.  AR 763-64.  In July 2010, Plaintiff exhibited no apparent memory or cognitive

21   deficits, and his thinking was clear and organized.  AR 484.  On mental status examination in

22   November 2010, Plaintiff had cooperative behavior, euthymic mood, normal cognition and he

23   appeared to be stable.  AR 490.  In August 2011, Plaintiff's cognition was organized and goal-

24   directed, his memory was intact, his mood was euthymic, and his affect was appropriate.  AR 792.

25   His social worker noted that Plaintiff seemed resistant to getting a job because he was busy with

26   legal proceedings and wanted to write a book.  AR 782.  In December 2011, Plaintiff's doctors

27   assessed improved anxiety and mood symptoms on higher dose of Effexor.  AR 779.  In January

28

United States District Court
Northern District of California

18

United States District Court
Northern District of California

2012, Plaintiff exhibited euthymic mood, full affect, intelligent, linear and logical thought process, cooperative and polite behavior, and no suicidal ideation.  AR 742, 744.  In April of 2012, Plaintiff had full range of affect, was easily engaged, and he had intelligent, linear, and logical thought process.  AR 739.  Based on this record, there is no indication that Plaintiff's mental impairments significantly limited his mental ability to do basic work activities, let alone reach the more stringent requirements of Listing 12.08.

In regards to Plaintiff's assertion that his pre-hearing brief cited supporting evidence for how he met each element of Listing 12.08, the referenced brief makes general allegations of mental dysfunction and argues that Plaintiff had marked restrictions in activities of daily living and social functioning.  AR 321.  However, the brief cites to no medical opinion in which these restrictions were made.  Plaintiff's "generalized assertion of functional problems" is insufficient to demonstrate that he met or equaled a listing at step three.  *Tackett*, 180 F.3d at 1100; *see also Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001) (claimant "offered no theory, plausible or otherwise, as to how his seizure disorder and mental retardation combined to equal a listed impairment.  Nor has he pointed to evidence that shows that his combined impairments equal a listed impairment").  Absent Plaintiff presenting evidence that he met "all of the specified medical criteria" of a listing, the ALJ did not err in continuing his analysis beyond step three.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see also Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005) ("An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence."); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir. 1990) (the ALJ need not explain "why a claimant failed to satisfy every different section of the listing of impairments").

As noted above, the claimant "bears the burden of proving that . . . she has an impairment that meets or equals the criteria of an impairment listed in Appendix 1 of the Commissioner's regulations."  *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005); *Tackett*, 180 F.3d at 1099.  Here, Plaintiff failed to articulate a plausible theory regarding how the specific criteria of any

19

United States District Court
Northern District of California

1    listing is met or equaled.  Accordingly, the ALJ's step three determination was without error.

2    **B.    RFC**

3             In his RFC assessment, the ALJ determined that Plaintiff could "perform a full range of

4    work at all exertional levels but is limited to simple repetitive tasks with occasional public

5    contact."  AR 14.  Plaintiff argues that the ALJ failed to discuss how the evidence supports the

6    RFC.  Pl.'s Mot. at 3.  Specifically, Plaintiff maintains that the ALJ neglected to indicate what

7    evidence he would find "persuasive," or what specific evidence he found unpersuasive.  *Id.* at 4.

8    Plaintiff also notes that the ALJ failed to mention the only medical opinion in the record, the State

9    agency reviewing opinion, and he did not link the RFC to any specific medical or nonmedical

10   facts such as daily activities, or base it on medical opinion evidence.  *Id.*

11            In response, Defendant argues that the ALJ's RFC finding is consistent with the only

12   medical opinion of record, that of State agency psychologist, Heather Barrons, Psy.D., who opined

13   that Plaintiff was capable of simple work and brief/limited public contact.  Def.'s Mot. at 4 (citing

14   AR 605, 616).  Defendant contends that, to the extent Dr. Barrons' opinion was consistent with

15   other evidence in the record, it constituted substantial evidence supporting the ALJ's RFC finding.

16   *Id.*

17            RFC is the most a claimant can do despite her limitations.  20 C.F.R. § 404.1545(a).  It is

18   assessed by considering all the relevant evidence in a claimant's case record.  *Id.*; *see also*

19   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  When a case is before an ALJ, it is the ALJ's

20   responsibility to assess a claimant's RFC.  20 C.F.R. § 404.1546(c); *see also Vertigan v. Halter*,

21   260 F.3d 1044, 1049 (9th Cir. 2001) ("It is clear that it is the responsibility of the ALJ, not the

22   claimant's physician, to determine residual functional capacity.").  "Generally, the more consistent

23   an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion."  20

24   C.F.R. § 416.927(c)(4).

25            Here, although Plaintiff disputes the ALJ's RFC finding, he largely relies upon his history

26   of "troubled behavior," dating back to 1984, and cites little evidence of significant dysfunction

27   during the relevant disability determination period.  Pl.'s Mot. at 7.  Though there is no dispute

28                                                          20

that Plaintiff has engaged in criminal and exhibitionist behavior in the past (AR 327, 332-33 –

lewd and indecent exposure; 340-42, 406 – grand theft and practicing medicine without a license),

such behavior did not persist during the relevant period.  In fact, upon his release from prison, a

treating social worker opined that Plaintiff appeared to have a "low risk" of sexual recidivism(AR

763, 767), and Plaintiff reported that he believed his exposure problem continued to be in

sustained remission, and that he no longer had any interest in deviant sexual behavior (AR 770).

Although he had many parole violations and brief periods of re-incarceration (AR 483, 502, 525,

591, 631, 635, 763, 781), he generally exhibited calm and cooperative behavior during treatment

appointments (AR 397, 408, 475-76, 488, 490, 744, 745, 748, 770).  Moreover, other than brief

periods of symptom exacerbation accompanying Plaintiff's arrests for parole violations (AR 502,

525, 530, 631, 635, 756), he received GAF scores ranging between 60 and 70, indicating only

mild to moderate mental symptoms (AR 395, 401, 410, 412, 475-76, 479, 484, 487, 770, 791).

Plaintiff also emphasizes his diagnosis of personality disorder and his poor listening skills.

Pl.'s Mot. at 8.  However, the mere diagnosis of personality disorder did not provide any insight

into the impairments limiting effects, nor did comments regarding Plaintiff's poor listening skills

during therapy sessions necessarily reflect his level of mental functioning.  *See Sample v.

Schweiker*, 694 F.2d 639, 642-43 (9th Cir. 1982) (an impairment alone is not "per se disabling";

rather, "there must be proof of the impairment's disabling severity").  During mental status

examinations, Plaintiff consistently demonstrated normal intellectual functioning, normal memory,

normal concentration, and normal thought process (AR 397, 400, 408, 475-76, 484, 488-90, 493,

722, 744, 763-64, 770, 792).  During this time, Plaintiff also reported writing a 300-page legal writ

(AR 531), spent his time reading and going to the law library (AR 33, 767), and intended to write

a book (AR 744, 783).  He seemed resistant to getting a job because he said he was busy with his

legal proceedings.  AR 782.

Additionally, in regards to Plaintiff's depression, treatment notes show that he experienced

significant improvement with medication.  Plaintiff reported that he had depression and suicidal

thoughts while incarcerated for four years, but anti-depressant medications "snapped [him] out of"

United States District Court
Northern District of California

United States District Court
Northern District of California

1

it.  AR 764.  He appeared brighter and more hopeful on anti-depressant medication (Effexor) (AR

2

779), and reported that it was helpful and effective at treating his depression and anxiety (AR 743-

3

744 – Depakote and Effexor "working well for him"; 776-78 – "Effexor at this dose is helping

4

mood and anxiety"; 779-81 – "effective without side effect" and Plaintiff "denie[d] feeling

5

depressed").  And, while taking anti-depressant medication, Plaintiff generally exhibited a

6

euthymic (non-depressed) mood during mental status examinations (AR 475-76, 488, 490-91, 493,

7

722, 736, 742, 744, 763-64, 792).  *See Warre v. Comm'r of Soc. Sec.*, 439 F.3d 1001, 1006 (9th

8

Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for

9

the purpose of considering eligibility for SSI benefits."); *Sample*, 694 F.2d at 642-44 (mental

10

impairments that are "amenable to control" are not disabling).

11

Finally, although Plaintiff argues that the ALJ committed error when he failed to mention

12

Dr. Barrons' opinion, Plaintiff subsequently concedes that the ALJ's RFC finding was consistent

13

with her opinion.  Pl.'s Mot. at 10 ("State agency opinion is consistent with the ALJ's RFC.").  Dr.

14

Barron opined that Plaintiff was capable of simple work and brief/limited public contact.  AR 605,

15

616.  As a nonexamining physician, Dr. Barrons' opinion is presumptively entitled to less weight

16

than the opinions of treating and examining physicians.  *See, e.g., Smolen v. Chater*, 80 F.3d 1273,

17

1285 (9th Cir. 1996) (explaining that a treating physician's opinion is entitled to greater weight

18

than the opinion of a nontreating, nonexamiming physician).  However, to the extent Dr. Barrons'

19

opinion was consistent with other evidence in the record, it constituted substantial evidence

20

supporting the ALJ's RFC finding.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996)

21

(findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as

22

other evidence in the record supports those findings); *Bray v. Comm'r of Soc. Sec. Admin.*, 554

23

F.3d 1219, 1221, 1227 (9th Cir. 2009) (the ALJ properly relied "in large part on the DDS

24

physician's assessment" in assessing the claimant's RFC).  Here, the record reflects that the ALJ

25

thoroughly reviewed all the evidence and, as discussed above, substantial evidence, including Dr.

26

Barrons' consistent opinion, supports the ALJ's RFC finding.  It is the ALJ's duty, not that of a

27

doctor, to determine RFC.  *See Vertigan*, 260 F.3d at 1049.  Plaintiff fails to point to any opinion

28

1    or other evidence, which makes Dr. Barrons' opinion or the ALJ's decision unreasonable.

2    Accordingly, the ALJ's RFC determination must be upheld.

3    **C.      Credibility**

4         In his decision, the ALJ found that Plaintiff's "medically determinable impairments could

5    reasonably be expected to cause the alleged symptoms; however, his statements concerning the

6    intensity, persistence and limiting effects of these symptoms are not entirely credible for the

7    reasons explained in this decision."  AR 17.  The ALJ reasoned that "[e]ven crediting the

8    claimant's testimony, there is nothing therein which would preclude work activity consisting of

9    simple, repetitive tasks, with only occasional public contact."  *Id.*

10        Plaintiff argues that this statement does not satisfy the requirement for specific reasoning,

11   as the ALJ identified no specific testimony that undermines his credibility.  Pl.'s Mot. at 4.

12   Plaintiff also argues that his hearing testimony, disability reports, and statements to doctors are not

13   consistent with the RFC as the ALJ alleged.  *Id.*  Specifically, he notes that he stated he was

14   occasionally disoriented and had difficulty with memory and periodic episodes of severe

15   depression (AR 242); his depression interfered with proper hygiene, grooming and sleep (AR

16   245); he did not eat well, had trouble sleeping and had difficulty taking care of himself due to his

17   depression (AR 281).  He conceded to his providers of pervasive interpersonal difficulties leading

18   to multiple relationship, job, and ultimately, legal problems (AR 489); and he reported a long

19   history of poor and impulsive behaviors and decision-making (AR 419).  Pl.'s Mot. at 4-5.

20   Plaintiff further argues that "the ALJ failed to consider that 'the characteristics that define a

21   personality disorder may not be considered problematic by the individual (i.e., the traits are often

22   ego-syntonic).  To help overcome this difficulty, supplemental information from other informants

23   may be helpful.'"  *Id.* at 5 (quoting American Psychiatric Association, Diagnostic and Statistical

24   Manual of Mental Disorders, 647 (5th ed. 2013).  Because he was not always aware of or

25   convinced of his disability, Plaintiff maintains that some of his statements are not dependable

26   indications of his functional capacity.  *Id.*

27        A two-step analysis is used when determining whether a claimant's testimony regarding

28                                                     23

United States District Court
Northern District of California

their subjective pain or symptoms is credible.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  First, it must be determined "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).  A claimant does not need to "show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom."  *Id.* (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)).

Second, if the claimant has met the first step and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so."  *Id.* (quoting *Smolen*, 80 F.3d at 1281).  "The ALJ must state specifically which testimony is not credible and what facts in the record lead to that conclusion."  *Smolen*, 80 F.3d at 1284.  Where the ALJ "has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record," courts must not engage in second-guessing.  *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989).  However, a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997) (citing *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995); *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986) ("'Excess pain' is, by definition, pain that is unsupported by objective medical findings.").

Factors that an ALJ may consider in weighing a claimant's credibility include: "[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or between [his] testimony and [his] conduct, claimant's daily activities, [his] work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which claimant complains."  *Thomas*, 278 F.3d at 958-59.  Here, the ALJ properly considered these factors in making an adverse credibility finding:

24

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual capacity assessment. (Exhibits 2F and 24F).   The claimant also reported that he is independent in dressing, feeding, and hygiene, and able to take out the garbage, do laundry, and drive and put gasoline into his car (Exhibit 5F, p.2).  At the hearing, he admitted that he drove several times per day, transporting his children to and from school and track practice.  He testified that he goes to the store with his wife, is active in his church, performs volunteer work, and plays video games.

While the claimant has an excellent work history and earnings record, the medical records do not show that he is incapable of light exertional activity.

(AR 27-28.)

While the failure of the medical record to fully corroborate a claimant's subjective symptom testimony is not, by itself, a legally sufficient basis for rejecting such testimony, it is a factor that the ALJ may take into account when making a credibility determination.  *See Rollins*, 261 F.3d 853, 856, 858 (9th Cir. 2001).  Thus, the Court finds that the ALJ did not err when she considered the lack of objective evidence and objective functional restrictions as a factor in assessing Plaintiff's credibility.

Here, although Plaintiff argues that the ALJ erred by providing a legally insufficient credibility evaluation, the ALJ noted that, "[e]ven crediting Plaintiff's testimony, there is nothing therein which would preclude work activity consisting of simple, repetitive tasks, with only occasional public contact."  AR 17.  Plaintiff fails to account for the fact that the ALJ determined the RFC determination would be the same regardless of his credibility.

Regardless, although Plaintiff generally claimed he could not work, he failed to identify any specific limitations that would prevent him from doing so.  *See* AR 27-36.  In fact, Plaintiff appeared to attribute most of his current stress and frustration to his parole conditions, as opposed to an underlying mental impairment.  AR 32, 35, 781.  He also admitted that he spent a great deal of time involved in litigation, including seeking out an attorney, reading, and going to the law library.  AR 33, 531, 767.  These activities are not inconsistent with Plaintiff's ability to perform

simple work and engage in occasional public contact.  *See Burch*, 400 F.3d at 681 (an ALJ may

discount a claimant's credibility if the claimant engages in numerous daily activities involving

skills that could be transferred to the workplace); *Light*, 119 F.3d at 793 (ALJ may also make an

adverse credibility finding if there are inconsistencies between the claimant's testimony about his

daily activities and his testimony about the nature, effect, or severity of his symptoms).  Moreover,

as discussed above, Plaintiff's intact cognition, cooperative behavior, and euthymic mood during

mental status examinations show that he did not have disabling mental symptoms, and he admitted

that anti-depressant medications were effective at treating his depression.  AR 475-76, 488, 490-

91, 493, 722, 736, 742-44, 763-64, 776-81, 792.  Accordingly, the Court finds that the ALJ's

decision is supported by substantial evidence and free of legal error.  Therefore, no reversible error

was committed.

**D.      ALJ's Duty to Develop the Record**

Finally, Plaintiff argues that, despite indication of significant social limitations, he was

never given a psychiatric or psychological evaluation.  Pl.'s Mot. at 10.  Plaintiff contends that

additional evidence submitted after the State agency review reveals the extent of his impairment

exceeds Dr. Barrons' opinion.  *Id.*  This evidence includes the psychiatric opinions contained in

reports of Plaintiff's medical license suspension, his behavior on parole, his obsession with

lawsuits, and frequent re-incarcerations.  *Id.* (citing AR 323-45, 620-800).  Additionally, Plaintiff

notes that at least one doctor noted that a clarifying diagnosis would likely require psychological

testing, which is further indication of the necessity of a consultative evaluation.  *Id.* (citing AR

778).  Plaintiff contends that the record "shows a disregard for the rights of others, repeated

performance of acts that are grounds for arrest, poor impulse control, deceitfulness, consistent

irresponsibility, and lack of remorse."  *Id.* at 7.

In response, Defendant argues that the evidence regarding Plaintiff's mental functioning

was neither ambiguous nor insufficient to allow proper evaluation.  Def.'s Mot. at 8.

"In Social Security cases, the ALJ has a special duty to develop the record fully and fairly

and to ensure that the claimant's interests are considered, even when the claimant is represented by

United States District Court
Northern District of California

United States District Court
Northern District of California

1   counsel." *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001) (citations omitted); *Webb v.*

2   *Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) ("The ALJ's duty to supplement a claimant's record

3   is triggered by ambiguous evidence, the ALJ's own finding that the record is inadequate or the

4   ALJ's reliance on an expert's conclusion that the evidence is ambiguous.").

5          However, it remains the claimant's duty to prove that he was disabled.  *Mayes*, 276 F.3d at

6   459 (citing 42 U.S.C. § 423(d)(5) (Supp. 2001) ("An individual shall not be considered to be

7   under a disability unless he furnishes such medical and other evidence of the existence thereof as

8   the Secretary may require.")).  The ALJ is only obligated to further develop the record if the

9   evidence is ambiguous or the record is inadequate.  *Id.* at 459-60 ("An ALJ's duty to develop the

10  record further is triggered only when there is ambiguous evidence or when the record is

11  inadequate to allow for proper evaluation of the evidence."); *Rodriguez v. Astrue*, 2010 WL

12  3835683, *5 (N.D. Cal. Sep. 28, 2010).

13         At the second step in his analysis, the ALJ determined that Plaintiff had the following

14  severe impairments: narcissistic personality disorder and antisocial personality disorder.  AR 13.

15  However, he determined that Plaintiff did not have an impairment or combination of impairments

16  that meets the listings, and therefore found that he has the RFC to perform a full range of work,

17  but limited him to simple repetitive tasks and occasional public contact.  AR 14.  As discussed

18  above, substantial evidence supports this finding.  The record contains many mental status

19  examinations, during which Plaintiff regularly exhibited cooperative behavior, normal

20  concentration and memory, euthymic (non-depressed) mood, and normal thought process.  AR

21  475-76, 488, 490-91, 493, 722, 736, 742, 744, 763-64, 792.  Progress notes also showed that anti-

22  depressant medications were effective at treating Plaintiff's depression.  AR 475-76, 488, 490-91,

23  493, 722, 736, 742-44, 763-64, 776, 777-81, 792.  Although Plaintiff was placed on an involuntary

24  hold for suicidal thoughts on each occasion he was arrested for a parole violation (AR 502, 525,

25  530, 631, 635, 756), it was noted that Plaintiff's suicidal allegations were "likely . . . an attempt to

26  avoid incarceration" (AR 633).  This is unambiguous evidence that allowed for proper evaluation

27  of Plaintiff's mental functional capacity.  Although the ALJ has a special duty to develop the

28                                                      27

1    record to ensure a claimant's interests are considered, that duty is triggered only where there is

2    "ambiguous evidence or when the record is insufficient to allow for proper evaluation of the

3    evidence."  *Mayes*, 276 F.3d at 459-60.

4         Further, the burden is on Plaintiff, not the Commissioner, to produce complete medical

5    records.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *see also Mayes*, 276 F.3d at 459 (it

6    is the claimant's duty to prove he is disabled); 42 U.S.C. § 423(d)(5)(A) (the claimant must

7    furnish medical and other evidence of his disability); 20 C.F.R. §§ 404.1512(c), 416.912(c) ("You

8    must provide medical evidence showing that you have impairment(s) and how severe it is during

9    the time you say you are disabled.").  While an ALJ may supplement the medical record by

10   ordering a consultative examination, ordering such an examination is not required.  *See* 20 C.F.R.

11   §§ 404.1512(e), 404.1517; 416.912(e), 416.917 ("we *may* ask you to attend one or more

12   consultative examinations") (emphasis added).  As the record before the ALJ was neither

13   ambiguous nor inadequate to allow for proper evaluation of the evidence, the Court finds that the

14   ALJ had no duty to develop the record.

15        Plaintiff also cites to the American Psychiatric Association's *Diagnostic and Statistical*

16   *Manual of Mental Disorders* ("DSM-V"), and argues that behavior and characteristics such as

17   those in the record can cause significant enough social limitations to result in a finding of

18   antisocial personality disorder[7] and narcissistic personality disorder.[8]  Pl.'s Mot. at 6.  However,

19   while personality disorders may cause significant social limitations resulting in a finding of

20   disability, the mere fact that Plaintiff was diagnosed with a personality disorder is itself,

21

22   [7] Under the DSM-V, antisocial personality disorder is characterized as a "disregard for and
     violation of the rights of others, occurring since age 15 years," as indicated by three or more of

23   several listed behaviors such as "failure to conform to social norms with respect to lawful
     behaviors, as indicated by repeatedly performing acts that are grounds for arrest"; and

24   "deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit
     or pleasure."  DSM-V at 659.  Other relevant behaviors are impulsivity, irritability and

25   aggressiveness, reckless disregard for safety of self or others, consistent irresponsibility, and lack
     of remorse.  *Id.*

26
     [8] Narcissistic personality disorder is characterized by a grandiose sense of self-importance, sense

27   of entitlement, interpersonally exploitative, lacking empathy, and requiring excessive admiration,
     among other behaviors.  *Id.* at 669-70.

28                                                                    28

United States District Court
Northern District of California

insufficient evidence of a disabling impairment.  *Sample*, 694 F.2d at 642-43 (an impairment alone is not "per se disabling"; rather, "there must be proof of the impairment's disabling severity").  Thus, any such diagnosis did not mandate the ALJ to develop the record further by ordering a consultative psychological examination.  Once again, it remains Plaintiff's duty to prove that he was disabled.  *Mayes*, 276 F.3d at 459.  Accordingly, the ALJ's decision is free of legal error.

### CONCLUSION

For the reasons stated above, the Court hereby **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Cross-Motion for Summary Judgment.  Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Dated: June 5, 2015

_____

MARIA-ELENA JAMES
United States Magistrate Judge